IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EUNICE J. WINZER, Individually | § | |
| and on behalf of the statutory beneficiaries | § | |
| of GABRIEL A. WINZER, SOHEILA | § | |
| WINZER AND HENRY WINZER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. 3:15-CV-1284 |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| KAUFMAN COUNTY, BILL CUELLAR, | § | |
| GARRY HUDDLESTON AND | § | |
| MATTHEW HINDS, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND
MOTION FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY**

S. Cass Weiland
State Bar No. 21081300
Robert A. Hawkins
State Bar No. 00796726
SQUIRE PATTON BOGGS (US) LLP
2000 McKinney Ave, Suite 1700
Dallas, Texas 75201
Ph:      (214) 758-1500
Fax:    (214) 758-1550
Email:  cass.weiland@squirepb.com
robert.hawkins@squirepb.com

ATTORNEYS FOR DEFENDANTS

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ ii

I.      SUMMARY ....................................................................................................... 1

II.     INTRODUCTION ............................................................................................. 1

III.    PROCEDURAL HISTORY ............................................................................. 3

IV.     SUMMARY JUDGMENT EVIDENCE ......................................................... 4

V.      SUMMARY JUDGMENT FACTS ................................................................. 5

VI.     ARGUMENT AND AUTHORITIES ........................................................... 10

        A.      *Standards for Summary Judgment* ................................................. 10

        B.      *Plaintiffs' Claims Against Defendants Huddleston and Cuellar Are Barred By the Statute of Limitations* ................................................. 11

        C.      *Defendants Are Also Entitled to Summary Judgment Based on Qualified Immunity* .................................................................................... 15

                1.      Standards for Qualified Immunity ............................................. 15

                2.      Claims for Excessive Force ....................................................... 16

                3.      Defendants Did Not Violate Winzer's Fourth Amendment Rights .......... 17

                4.      Defendants' Actions Were Also Objectively Reasonable Under Clearly Established Law ....................................................... 21

                5.      The Absence or Presence of a Real Gun is Irrelevant to the Court's Summary Judgment Determination. ....................................... 23

VII.    CONCLUSION ................................................................................................ 24

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)..........................................................11

*Antoine v. First Student, Inc.*,
   713 F.3d 824 (5th Cir. 2013) ..............................................................................................11

*Austin v. Johnson*,
   328 F.3d 204 (5th Cir. 2003) ..............................................................................................24

*Cantu v. Rocha*,
   77 F.3d 795 (5th Cir. 1996) ................................................................................................24

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).............................................................................................................11

*City of Lancaster v. Chambers*,
   883 S.W.2d 650 (Tex. 1994).................................................................................................24

*In re Estate of Pollard v. Hood County*,
   579 Fed. App'x. 260, 2014 U.S. App. LEXIS 16376 (5th Cir. Aug. 25, 2014)
   ("To impose liability on a municipality under § 1983, plaintiffs must first
   show that a municipal employee committed a constitutional violation.").............................21

*Hathaway v. Bazany*,
   *507 F.3d 312 (5th Cir. 2007)* ..............................................................................................11

*Jacobsen v. Osborne*,
   133 F.3d 315 (5th Cir. 1998) ..............................................................................................14

*Luna v. Mullenix*,
   773 F.3d 712 (5th Cir. 2014) ..............................................................................................18

*Luna v. Mullenix*,
   777 F.3d 221 (5th Cir. 2014) (Jolly, J., dissenting) ............................................................22

*Malley v. Briggs*,
   475 U.S. 335 (1986).............................................................................................................15

*Manis v. Lawson*,
   585 F.3d 839 (5th Cir. 2009) .............................................................................18, 19, 21, 22

*Matsushita Elect. Indust. Co. v. Zenith Radio*,
   475 U.S. 574 (1986).............................................................................................................11

*Mullenix v. Luna*,
    136 S. Ct. 305 (2015) (per curiam) ...................................................................18, 22

*Mullenix v. Luna*,
    577 U.S. ___ (2015)...........................................................................................16

*Paul v. G.P.D.A., Inc.*,
    2003 U.S. Dist. LEXIS 20833 (N.D. Tex. Nov. 19, 2003) (Godbey, J.) ....................12, 13, 14

*Pearson v. Callahan*,
    555 U.S. 223 (2009)..........................................................................................15, 16

*Poole v. City of Shreveport*,
    691 F.3d 624 (5th Cir. 2012) ..............................................................................16, 17

*Reese v. Anderson*,
    926 F.2d 494 (5th Cir. 1991) ..............................................................................19

*Saucier v. Katz*,
    533 U.S. 194 (2001)..........................................................................................16

*Scott v. Harris*,
    550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) ......................................11

*Shabazz v. Communications Workers of America/Texas State Employees Union*,
    No. 3:02-CV-2698-M, 2003 U.S. Dist. LEXIS 17262 (N.D. Tex. Sept. 30,
    2003) (Lynn, J.)...............................................................................................11, 12

*Thomas v. Baldwin*,
    595 Fed. Appx. 378, 2014 U.S. App. LEXIS 24060 (5th Cir. Dec. 19, 2014) ......15, 16, 19, 23

**Statutes**

42 U.S.C. § 1983..............................................................................................*passim*

42 U.S.C. § 1983, a Section 1983 ......................................................................4

**Other Authorities**

Fourth Amendment ...........................................................................................*passim*

*Appendix* at 34-43 ..........................................................................................*passim*

*Appendix* at 34-43, 49-51 ...............................................................................23

Fed. R. Civ. P. 15(c) ........................................................................................12, 13, 14, 15

Fed. R. Civ. P. 56(c) ........................................................................................11

Rule 56(c) of the Federal Rules of Civil Procedure....................................................................11

Local Rule 56.6............................................................................................................................4

Rule 7(a).......................................................................................................................................4

Rule 15(c)(1)(C).........................................................................................................................12

Rule 15(c)(3).........................................................................................................................14, 15

010-8172-0872/1/AMERICAS

## I.    SUMMARY

This is a § 1983 case involving a shooting death in Kaufman County, Texas.   The Plaintiffs claim the deceased was an unarmed victim of law enforcement.   In fact, the deceased was armed, had been terrorizing a residential neighborhood, and the police action was necessary to prevent further mayhem.   No constitutional violation occurred.   The officers involved, two of whom were sued after limitations expired, are entitled to dismissal or summary judgment.

## II.    INTRODUCTION

This lawsuit was filed pursuant to 42 U.S.C. § 1983, approximately two years after the shooting death of Gabriel A. Winzer ("Winzer" or "Gabriel") by local law enforcement officers in Kaufman County, Texas.   The Third Amended Complaint portrays Winzer as a benevolent, well-known, well-behaved, law-abiding citizen of Kaufman County.   But nothing could be further from the truth.   On the morning of April 27, 2013, numerous frightened Kaufman County residents called 911 dispatchers and reported that a man (later identified as Winzer) was walking up and down their neighborhood roads, brandishing a handgun, shooting at mailboxes, and threatening neighbors.   Winzer was quoted as yelling "everyone's going to get theirs" and he wanted to "get back what's mine."   The terrified callers had no clue who Winzer was.

Upon receiving these calls, dispatchers radioed local law enforcement officers in the area, including deputies with the Kaufman County Sheriff's Office (KCSO) and state troopers with the Texas Department of Public Safety (DPS).   Multiple officers from both agencies, having been advised of an individual in the area shooting a handgun, responded to the scene.

Dash-cam videos from the squad cars captured the initial arrival of the officers and the subsequent shooting of Winzer. KCSO Deputy Matthew Hinds and DPS Trooper Gerardo Hinojosa were the first to arrive on the scene.   As they arrived, the officers spotted Winzer

- 1 -

standing in the middle of the road.  After they stopped and exited their vehicles, Winzer turned toward the officers and fired his handgun at them.  Hinds and Hinojosa both observed smoke coming from the weapon and Hinojosa heard the "whizzing" sound of a bullet go by.  Hinds quickly reported "shots fired" over his police radio to dispatchers and others.  Hinds and Hinojosa then lost sight of Winzer.

KCSO deputies, Gary Huddleston, Bill Cuellar, and Keith Wheeler, soon arrived at the scene.  Pursuant to their training, the officers set up and approached the location where Winzer was last seen.  They slowly proceeded down the roadway toward Winzer giving multiple warnings over the PA system on their vehicle for Winzer to come out and drop his handgun. With other neighbors in the area, the officers were concerned for everyone's safety, including their own. As they were deciding how to engage Winzer, he suddenly appeared from a wooded area riding a bicycle down the road toward the officers.  Winzer appeared to have a gun in his hand, which he started to point toward the officers.  After yelling for him to "put the gun down," which Winzer ignored, the officers fired multiple shots at him. Winzer fell off the bicycle and disappeared again into an unknown location.

After several minutes, the officers moved into the area where Winzer left the road, and they found him and his father, Plaintiff Henry Winzer, in the back yard of their residence. Gabriel Winzer was on the ground.  The officers repeatedly ordered Henry Winzer to move away from his son and to come towards them with his hands up. But he refused. Henry Winzer confirmed that Gabriel had been shot.  When the officers asked about the handgun that Gabriel had, Henry Winzer claimed it was only a toy gun and tossed a dark-colored plastic gun in their direction.[1]  As the officers attempted to handcuff the younger Winzer, he resisted, forcing two of

---

[1] A gunshot residue (GSR) analysis later confirmed the presence of gunshot residue on Winzer.

- 2 -

the officers to use their tasers to subdue him.  Once Winzer was handcuffed, EMS personnel entered the back yard of the residence to examine him, but he had expired.

### III.    PROCEDURAL HISTORY

The procedural history of this suit is somewhat complicated but critical to the Court's disposition of this Motion.  (*See* Dkt. 24 for a brief description of the procedural history).  On April 22, 2015, five days before the expiration of the two-year statute of limitations, Henry Winzer filed a *pro se* lawsuit in the U.S. District Court for the Western District of Texas.[2]  In his complaint, Mr. Winzer named as Defendants KCSO Deputy Matthew Hinds and other unidentified persons – a DPS trooper and EMS responders.  (*See* Dkt. 1, Cause No. 3:15-cv-1295).  On April 27, 2015, Mr. Winzer's case was transferred from the Western District of Texas to the Northern District of Texas and assigned Cause No. 3:15-CV-1295.

Meanwhile, also on April 27, 2015, Eunice and Sohelia Winzer filed a separate lawsuit in the U.S. District Court for the Northern District of Texas which was assigned Cause No. 3:15-CV-1284.  This suit named as Defendants Kaufman County, the City of Kaufman, and the City of Terrell.  (*See* Dkt. 3).  No individuals were included as Defendants.  Ultimately, the two City entities were dismissed (*see* Dkt. 35), and Plaintiffs obtained permission from the Court to file their Third Amended Complaint, which was filed on September 21, 2015.  (*See* Dkt. 23).  The Third Amended Complaint named Kaufman County and Matthew Hinds as Defendants and, for the first time, KCSO Deputies Bill Cueller and Gary Huddleston were included in this suit.  On September 21, 2015, the Court consolidated the two lawsuits.  (*See* Dkt. 24).

---

[2] At the time he filed his suit, Mr. Winzer was an inmate in the Texas Department of Criminal Justice, following his conviction and sentence for aggravated assault on a public servant.  Mr. Winzer's prosecution, conviction, and sentence resulted from the events transpiring on the morning of April 27, 2013.

- 3 -

The Third Amended Complaint alleges claims for excessive force under 42 U.S.C. § 1983, a Section 1983 claim against Kaufman County for failure to train its officers, and it appears to allege state law actions for survival and wrongful death.  Plaintiffs seek damages resulting from Winzer's death, including punitive damages.  On October 13, 2015, Defendants filed their Answer to the Third Amended Complaint, asserting numerous defenses, including governmental and/or qualified immunity, and the statute of limitations. (*See* Dkt. 37).

On November 20, 2015, the Court issued its Scheduling Order – Qualified Immunity instructing Plaintiffs to file a Rule 7(a) reply and ordering that any motion to dismiss or motion for summary judgment asserting qualified immunity to be filed within 60 days, or by January 20, 2016.  Pursuant to the Scheduling Order, Defendants are filing this Motion requesting summary judgment based on (1) the statute of limitations as it pertains to the late joinder of Defendants Bill Cuellar and Gary Huddleston; and (2) qualified immunity as to all Defendants.  Based on the evidence and discussion below, Defendants urge the Court to grant this Motion and dismiss Plaintiffs' claims with prejudice.

## IV.     SUMMARY JUDGMENT EVIDENCE

Pursuant to Local Rule 56.6, Defendants are contemporaneously filing an Appendix in support of this Motion which contains the following evidence and is incorporated herein by reference:

- Voluntary Statement of Matthew Hinds, included as *Exhibit A*;

- Voluntary Statement of Gerardo Hinojosa, included as *Exhibit B*;

- Voluntary Statement of Gary Huddleston, included as *Exhibit C*;

- Voluntary Statement of William Cuellar, included as *Exhibit D*;

- Voluntary Statement of Keith Wheeler, included as *Exhibit E*;

- 4 -

- Declaration of Aneli Dorough, included as *Exhibit F*;

- Transcripts of 911 and radio traffic audio recordings, included as *Exhibit F-1*;

- CD containing video dash-cam recording from Unit 185 (KCSO Deputy Keith Wheeler), included as *Exhibit F-2*;

- CD containing video dash-cam recording from Unit 1168 (DPS Trooper Gerardo Hinojosa), included as *Exhibit G*;

- Declaration of Zoe M. Smith with Gunshot Residue (GSR) Laboratory Report and Firearms/Toolmarks Laboratory Report, included as *Exhibit H*;

- Autopsy of Gabriel Almondiah Winzer, included as *Exhibit I*.

## V.      SUMMARY JUDGMENT FACTS

### *911 Calls and Initial Reports About Winzer*

1.      In the morning hours of April 27, 2013, Kaufman County 911 dispatchers began receiving phone calls from local citizens reporting a man with a handgun walking around County Roads 316 and 316A in Elmo, Texas.   Numerous phone callers reported that the man was carrying a gun.  *See Appendix* at 34-43.   Some of the callers reported that the man was shooting and/or pointing his gun at random, while others reported he was knocking down and shooting at mailboxes, and threatening neighbors.  *See id.*  One caller quoted the man as yelling "everyone's going to get theirs" and he wanted to "get back what's mine."  *See id.* at 39-40.   Callers were terrified and pleaded with dispatchers to get the police to respond to their location.  *See id.* at 34-43.

2.      As the 911 calls were coming in, the dispatchers alerted multiple law enforcement officers in the area, including KCSO Deputies Hinds, Cuellar, and Huddleston.  *See id.* at 44-45. The officers were told that multiple calls had been received, and that the male suspect was

walking up and down the road shooting mailboxes, and threatening (or shooting at) neighbors. *See id.* at 2-3, 8-9, 13-14, 19-20, 25-26, 44-45. Hinds and Texas DPS Trooper Gerardo Hinojosa (among others) advised that they were en route to the scene.  *See id.*

*Arrival at the Scene and First Encounter With Winzer*

3.      Hinds and Hinojosa, both in their marked patrol units, were the first officers to arrive to the area.  *See id.* at 2-3, 8-9. By the time they arrived, dispatchers advised that the suspect (later identified as Winzer) was on County Road 316.  *Id.*

4.      As the officers proceeded down County Road 316, they observed Winzer in the middle of the roadway at about the intersection of County Road 316 and County Road 316A.  *Id.* Hinds saw what appeared to be a boat oar in one hand and an unknown object in Winzer's other hand.  *Id.* at 3. The officers stopped and exited their vehicles about 100-150 yards away from Winzer and armed themselves. *Id.* at 3, 8-9; *see also id.* (Exhibit G).[3]

5.      Shortly thereafter, both officers saw Winzer turn to face them.  *Id.* at 3, 8-9.  At that point, Winzer raised his right hand and fired a shot at Hinds and Hinojosa.  *Id.*  Both officers observed smoke coming from the gun, and Hinojosa heard the "whizz" of a bullet go by.  *Id.* at 3, 9.  Hinds and Hinojosa believed that Winzer was shooting directly at them.  *Id.* Hinds quickly reported "shots fired" over his car radio (*see id.* at 3, 9, 44 and Exhibit G), which other responding officers heard.  *Id.* at 14, 20, 26.

6.      Hinds and Hinojosa both took cover, but neither returned fire because of the danger to other citizens in the area who were behind Winzer's location.  *Id.* at 3, 9.  Winzer then walked toward County Road 316A and disappeared from the officers' view.  *Id.* Hinds and Hinojosa waited for other officers to arrive. *Id.*

---

[3] Exhibit G to the Appendix is being filed under separate cover.

*Arrival of Other Officers and Staging of the Roadway*

7.  KCSO Deputy Keith Wheeler arrived at the scene and, along with Hinds and Hinojosa, positioned their vehicles at the intersection of County Road 316 and County Road 316A to be closer to Winzer's location and to block the roadways for the safety of others.  *Id.* at 3, 9, 26. Deputies Cuellar and Huddleston, also driving their marked patrol units, arrived at the same location shortly thereafter.  *Id.* at 3-4, 9, 14, 20.

8.  The officers received an update from the first responders.  Hinds advised that Winzer had fired at them when they first arrived on the scene. *Id.* at 14, 20. In addition, dispatchers reported that Winzer was down at the end of County Road 316A.  *Id.*

9.  Using the PA system on his vehicle (a marked Chevy Tahoe), Deputy Wheeler identified themselves to Winzer as the Kaufman County Sheriff's Office and directed him to drop his gun and to come toward them. *Id.* at 9, 20, 26; *see also* Exhibit F-2.[4]  Winzer ignored the officers and again disappeared from their view.  *Id.* at 9, 20-21, 26.

10.  Given the presence of other citizens in the area, the officers decided they needed to maneuver themselves between the citizens and Winzer for everyone's safety by proceeding down County Road 316A closer to Winzer's last location.  *Id.* at 4, 9, 14, 20, 26. They used Deputy Wheeler's Tahoe as a lead cover vehicle, while Huddleston followed behind them in his vehicle. *Id.*  The other officers (Hinds, Cuellar, and Hinojosa) were positioned on foot outside and around Wheeler's Tahoe.  *Id.* at 4, 9, 20.  All of the officers were armed.  *Id.* at 4, 9, 14, 20, 26.

11.  The group of officers slowly proceeded down County Road 316A, directing people to get back into their homes.  *Id.* at 4, 14, 20-21, 26.  One citizen directed the officers to

---

[4] Exhibit F-2 to the Appendix is being filed under separate cover.

the end of the road where Winzer was thought to be located.  *Id.* at 20.  As they approached, the officers saw Winzer briefly walk off the road and into a ditch toward a house.  *Id.* 21, 26.  In addition, dispatchers advised that Winzer may have gone into a house.  *Id.* at 4.

12.     The officers again gave verbal commands identifying themselves and instructing Winzer to drop his weapon and come out.  *Id.* at 4, 21, 26.  The officers eventually stopped closer to Winzer's last known location, angling the Tahoe to give them better cover.  *Id.* at 4; *see also* Exhibit F-2.  They maintained their position and were considering how to establish a perimeter to determine Winzer's location.  *Id.* at 14, 21, 26; *see also* Exhibit F-2.

*Winzer Suddenly Appears on a Bicycle*

13.     While the officers were maintaining their position, Winzer entered County Road 316A riding a bicycle toward them approximately 90-100 yards away.  *Id.* at 4, 9, 14-15, 21, 27; *see also* Exhibit F-2.  All of the officers spotted him.  *Id.*  One of the officers said Winzer has "that gun."  *Id.* at 21.  The officers saw Winzer raise his arm, they saw a gun (or an object) in his hand, and they believed he was about to fire at them.  *Id.* at 4, 9, 15, 21, 27. Officer Cuellar yelled for Winzer to "put the gun down."  *Id.* at 4, 9, 21; *see also* Exhibit F-2. After Winzer refused, and fearing that he was about to shoot at them, the officers shot at Winzer with their service weapons.  *Id.* at 4, 9, 15, 21, 27; *see also* Exhibit F-2.

14.     Winzer veered to the left, fell to the ground, left the bicycle, and disappeared from the officers' view again.  *Id.*; *see also* Exhibit F-2.  After holding their position for a while, the officers proceeded to where Winzer disappeared and attempted to set a perimeter around the house located there.  *Id.* at 4-5, 9, 21, 27; *see also* Exhibit F-2.

*At the Winzer Home*

- 8 -

15.     Once the officers surrounded the home, they again identified themselves and repeated verbal commands for Winzer to come out with his hands up.  *Id.* at 5, 9, 15, 21, 27; *see also* Exhibit F-2.  Cuellar and Hinds were together on one side of the residence, while Hinojosa and fellow DPS Trooper Brad Brewer, who had recently appeared on the scene, moved to a different vantage point. *Id.*

16.     After several minutes, and more ignored commands to come out of the house, the officers found Winzer and another unknown black male (later identified as Henry Winzer, Gabriel's father) in the back yard of the residence.  *Id.* at 9-10, 21; *see also* Exhibit F-2.  The officers directed the father to move away from Winzer and to come toward them with his hands up, but he refused.  *Id.* at 5, 9, 21-22, 27.  He advised the officers Winzer had been shot.  *Id.* at 10, 21.  When the officers asked about the gun Winzer had, the father claimed it was only a toy gun and tossed a dull-colored plastic gun in their direction.  *Id.* at 5, 10, 22.

18.     The officers again told the father to move away from Winzer so they could get an ambulance in to treat him, but the father refused.  *Id.* at 22, 27. The officers approached Winzer and his father to try and handcuff them and secure the scene.  *Id.* at 5, 22, 27; *see also* Exhibit F-2.

19.     Hinds attempted to apprehend Winzer, but he resisted and began fighting back.  *Id.* at 5.  Hinds described him as strong, with wide-opened, wild-looking eyes and growling.  *Id.* Hinds was able to get one handcuff on Winzer, but he resisted with the other hand, closed the open cuff on Hinds' hand, and attempted to bite him.  *Id.* Winzer also kicked at Hinds and took swings at his face.  *Id.* Trooper Brewer moved in to assist Hinds, but Winzer fought both of them.  *Id.*   Winzer was still resisting so Trooper Brewer deployed his taser.  *Id.* at 5, 15.  Huddleston also used his taser.  *Id.* Shortly thereafter, he went limp, stopped resisting, and the

- 9 -

officers were able to get him handcuffed.  *Id.*  EMS paramedics who arrived at the scene entered the back yard to check on Winzer, but he had expired.  *Id.* at 10, 16, 22, 28.

20.     Winzer's autopsy shows he died of four (4) gunshot wounds, and that he had the presence of marijuana in his system.  *Id.* at 59-65.  In addition, a gunshot residue (GSR) analysis by the DPS Crime Lab showed the presence of residue leading to the conclusion that (A) Winzer had fired a weapon; (B) Winzer had been in immediate proximity of a weapon as it is being fired; or (C) Winzer contacted a surface with gunshot primer residue particles.  *See id.* at 49-51.

## VI.     ARGUMENT AND AUTHORITIES

In the Third Amended Complaint filed on September 21, 2015, Plaintiffs allege claims for excessive force and failure to train under 42 U.S.C. § 1983, and they appear to assert survival and wrongful death actions under Texas state law.  (*See* Dkt. 23 at 8, 10, 13).  All of the claims arise from the shooting death of Winzer on April 27, 2013, as described above.

The events leading up to the shooting, and its immediate aftermath, were caught on dash-cam videos and recorded calls. This includes recorded 911 calls from numerous citizens reporting that Winzer was walking up and down their neighborhood roads, carrying a handgun, shooting at or threatening neighbors, and tearing up mailboxes. These reports were relayed by dispatchers to the law enforcement officers responding to the scene.   When viewed in conjunction with the undisputed evidence that Winzer fired at the first responders, and his conduct afterwards, there is no doubt that the individual Defendants were authorized to use deadly force, and that they acted objectively reasonable given the circumstances they confronted. Hence, they are entitled to qualified immunity.

### A.     *Standards for Summary Judgment*

- 10 -

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue of material fact and the moving party demonstrates it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.  An issue is not "genuine" when there is nothing more than "some metaphysical doubt as to the material facts."  *Matsushita Elect. Indust. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris,* 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). Factual controversies are resolved in favor of the nonmoving party, "but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Antoine v. First Student, Inc.,* 713 F.3d 824, 830 (5th Cir. 2013) (internal quotation marks and citation omitted). "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)* (internal quotation marks and citation omitted). Summary judgment is not to be viewed as a procedural shortcut, "but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B.**     ***Plaintiffs' Claims Against Defendants Huddleston and Cuellar Are Barred By the Statute of Limitations***

Because federal law does not provide a limitations period for Section 1983 actions, federal courts in Texas look to Texas state law for the applicable limitations period.  *See Shabazz*

- 11 -

*v. Communications Workers of America/Texas State Employees Union*, No. 3:02-CV-2698-M, 2003 U.S. Dist. LEXIS 17262 at *8 (N.D. Tex. Sept. 30, 2003) (Lynn, J.) (citations omitted). Under Texas law, the limitations period is two years. *Id.* (citing Tex. Civ. Prac. & Rem. Code § 16.003(a) (West 2003)).

Here, the limitations period for Plaintiffs' claims under Section 1983 commenced on April 27, 2013, when the acts resulting in Winzer's death occurred.  Hence, the deadline for bringing the Section 1983 claims was April 27, 2015.  However, Defendants Cuellar and Huddleston were not joined as parties to this action until September 21, 2015, with the filing of the Third Amended Complaint some five months after the limitations period expired.  (*See* Dkt. 24).  Therefore, Plaintiffs' claims against Cuellar and Huddleston are barred by limitations unless Plaintiffs can show that an exception applies.  *See Paul v. G.P.D.A., Inc.*, 2003 U.S. Dist. LEXIS 20833 at *4-5 (N.D. Tex. Nov. 19, 2003) (Godbey, J.).

The only possible exception might be the "relation back" provision found in Fed. R. Civ. P. 15(c).  Rule 15(c)(1)(C) provides that an amendment of a pleading relates back to the date of the original pleading when:

> the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment (i) received such notice of the action that it will not be prejudiced in defending on the merits, and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

FED. R. CIV. P. 15(c)(1)(C).   "[T]o avoid the statute of limitations through relation back, a plaintiff must show that: (1) the basic claim has arisen out of the conduct set forth in the original proceeding; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) the party must or should have known that, but for a

- 12 -

mistake concerning identity, the action would have been brought against it; and (4) the second and third requirements must have been fulfilled within the prescribed limitations period. *See Paul*, 2003 U.S. Dist. LEXIS 20833 at *5-6 (citing *Jacobsen v. Osborne*, 133 F.3d 315, 319 (5th Cir. 1998) (other citations omitted).  Rule 15(c) is "meant to allow an amendment changing the name of a party to relate back to the original complaint only if the change is the result of an error, such as a misnomer or misidentification." *See id.* (quoting *Jacobsen*, 133 F.3d at 320) (other citations omitted).

This case commenced with the filing of two original complaints, both of them virtually on the eve of the expiration of the limitations period.  Plaintiff Henry Winzer filed his complaint in the Western District of Texas on April 22, 2015 (*see* Dkt. 1, Cause No. 3:15-cv-1295, at 1), while Plaintiffs Eunice and Sohelia Winzer filed their complaint on April 27, 2015 in the Northern District of Texas. (*See* Dkt. 3 at 1).  The only complaint, however, which included any individual Defendants was Henry Winzer's complaint, where he named Defendant Hinds and other unidentified persons – "unknown State Troopers individually and in their capacity as member[s] of Texas Dept. of Public Safety" and "unknown paramedics individually and in their capacity as emergency responders of the East Texas EMS."[5]  (*See* Dkt. 1, Cause No. 3:15-cv-1295, at 1, 3).  As noted above, Defendants Cuellar and Huddleston were neither State Troopers nor EMS personnel and were not joined as Defendants until five months later on September 21, 2015.

With respect to the "relation back" requirements in Rule 15(c), Plaintiffs cannot demonstrate that, within the prescribed limitations period, Cuellar and Huddleston received notice of this action or that they must or should have known this action would have been brought

---

[5] Eunice and Sohelia Winzer's original complaint names Kaufman County, the City of Kaufman, and the City of Terrell as Defendants.  *See* Dkt. 3.

- 13 -

against them, but for a mistake concerning their identity.  There was no mistake concerning the identities of Cuellar or Huddleston, and they took no action to conceal their identities or otherwise mislead Plaintiffs in any manner.  Plaintiffs waited until the end of the limitations period, then filed their complaints omitting Cuellar and Huddleston as Defendants.  Eunice and Sohelia Winzer sued no individual Defendants, and Henry Winzer sued an unnamed DPS Trooper(s) and unnamed paramedics.  This is not the kind of misnomer or misidentification remedied by the relation back provisions in Rule 15(c).

Indeed, the Fifth Circuit's decision in *Jacobsen v. Osborne*, which this Court has previously addressed,[6] disposes of this issue.  In *Jacobsen*, the Fifth Circuit held that a plaintiff who sued unnamed deputies identified only as "John Doe" under Section 1983 was not permitted to substitute the intended parties under Rule 15(c) after the statute of limitations ran.  *Id.* (discussing *Jacobsen*, 133 F.3d at 320-21).  The Court reasoned that the proper identities of the intended defendants could have been readily ascertained through greater diligence by the plaintiff, and the statute of limitations bar could have been avoided.  *Id.* (citing *Jacobsen*, 133 F.3d at 321).  Hence, because plaintiff could have identified the proper parties and amended the complaint within the prescribed limitations period, "'the proposed amendment as to the deputies was not necessitated by the 'mistake' or 'misidentification' at which Rule 15(c)(3) is aimed. For such a situation, the Rule does not allow relation back to the filing of the original complaint.'" *Id.* (quoting *Jacobsen,* 133 F.3d at 321-22) (also citing *Hazelton v. City of Grand Prairie,* 8 F. Supp. 2d 570, 581 (N.D. Tex. 1998) (citation omitted) (plaintiff who could not identify police officer until after statute of limitations ran "has not shown that he simply misidentified Moreno

---

[6] *See Paul*, 2003 U.S. Dist. LEXIS 20833 at *10-11.

010-8172-0872/1/AMERICAS

due to a mistake; instead, Plaintiff did not know his identity at all. Plaintiff has therefore failed to satisfy the misidentification situation which Rule 15(c)(3) seeks to address.").

In sum, Plaintiffs cannot show they are entitled to the protections of the "relation back" provisions in Rule 15(c).   Plaintiffs could have discovered the identities of Cuellar and Huddleston long before the limitations period expired but, instead, they sat on their claims and did nothing until their time ran out.   Thus, Plaintiffs' claims against Huddleston and Cueller are barred by the statute of limitations, and they should be dismissed.

**C.**      ***Defendants Are Also Entitled to Summary Judgment Based on Qualified Immunity***

The individual Defendants asserted qualified immunity as a defense to Plaintiffs' claims under Section 1983. (*See* Dkt. 37).   Consequently, the usual summary judgment burden shifts to Plaintiffs to show that the defense is not available.   *See Thomas v. Baldwin*, 595 Fed. Appx. 378, *381, 2014 U.S. App. LEXIS 24060 (5th Cir. Dec. 19, 2014) (citing *Kovacic v. Villarreal,* 628 F.3d 209, 211 (5th Cir. 2010)).

1.   Standards for Qualified Immunity

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

- 15 -

To determine whether qualified immunity exists, the Court conducts the two-part analysis set forth in *Saucier v. Katz,* 533 U.S. 194 (2001), as modified by *Pearson v. Callahan,* 555 U.S. 223 (2009). *See Thomas*, 595 Fed. App'x. at 381. That is, to defeat summary judgment, Plaintiffs must show a genuine dispute of material fact about whether (1) each of the individual Defendants violated Winzer's Fourth Amendment right to be free from excessive force; and (2) whether their actions were objectively unreasonable in the light of clearly established law at the time of the conduct. *See id.* (citing *Poole v. City of Shreveport,* 691 F.3d 624, 627 (5th Cir. 2012)). The Court may address these prongs in either order. *Id.* (citing *Pearson,* 555 U.S. at 236. Indeed, the Supreme Court recently reversed the denial of qualified immunity without addressing the constitutional question. *Mullenix v. Luna*, 577 U.S. ___ (2015).

### 2.   Claims for Excessive Force

To prevail on a claim for excessive force under the Fourth Amendment, Plaintiffs must show "(1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *See id.* (quoting *Manis v. Lawson,* 585 F.3d 839, 843 (5th Cir. 2009) (internal quotation marks and citation omitted)); *see also Poole*, 691 F.3d at 628 (citation omitted). If Plaintiffs cannot establish all of these elements, qualified immunity applies. An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, if "the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Id.* (quoting *Manis*, 585 F.3d at 843) (internal quotations omitted).

Whether the force used was reasonable is an objective inquiry. *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)). Plaintiffs must show that the use of deadly force was objectively unreasonable "in light of the facts and circumstances

- 16 -

confronting" the officer.  *See id.* (quoting *Ontiveros v. City of Rosenberg, Tex.,* 564 F.3d 379, 382 (5th Cir. 2009) (internal quotations omitted)).  "In determining whether an officer's use of force was objectively reasonable, courts must be mindful that police officers are often required to make split-second judgments 'in circumstances that are tense, uncertain, and rapidly evolving' and must evaluate an officer's use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Id.* (quoting *Graham,* 490 U.S. at 396-97); *see also Poole*, 691 F.3d at 628 ("To make out a *Fourth Amendment* violation, let alone one that violates clearly established law, the question is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.") (citation and internal quotations omitted)

### 3.   Defendants Did Not Violate Winzer's Fourth Amendment Rights

Plaintiffs allege that Defendants used excessive force and acted unreasonably when they shot and "tased" Winzer on April 27, 2013.  These two issues – whether the force was "clearly excessive" and "clearly unreasonable" – are separate inquiries in the qualified immunity analysis.  *See Poole*, 691 F.3d at 628. However, they are often intertwined and addressed simultaneously.  *Id.*. (citing *Deville,* 567 F.3d at 167 (addressing  simultaneously the questions of whether the force was "excessive" or "unreasonable").  Moreover, to the extent possible, the Court should evaluate each Defendant's actions separately.  *Id.* (citing *Meadours v. Ermel,* 483 F.3d 417, 421-22 (5th Cir. 2007) (holding that each officer's individual actions should be considered in determining whether qualified immunity applies).  When the events that unfolded on April 27, 2013 are viewed from the Defendants' perspective and the circumstances they confronted, their use of deadly force was not only reasonable for their own safety and the safety of others, it was authorized under well-settled controlling law.

- 17 -

Long before April 27, 2013, Supreme Court and Fifth Circuit precedent allowed deadly force when an officer had "probable cause to believe that the suspect pose[d] a threat of serious physical harm." *See Manis*, 585 F.3d at 846 (citing *Tennessee v. Garner,* 471 U.S. 1, 11-12, 105 S. Ct. 1694, 1701, 85 L. Ed. 2d 1 (1985); *Reese v. Anderson,* 926 F.2d 494, 500-01 (5th Cir. 1991); *Young v. City of Killeen, TX,* 775 F.2d 1349, 1352-53 (5th Cir. 1985)).   As further illustrated in *Manis*, the Fifth Circuit has found the use of deadly force to be reasonable (and not excessive) when a suspect moves out of the officer's sight and the officer reasonably believes he could have been reaching for a weapon (citing *Ontiveros*, 564 F.3d at 381, 385); or when the suspect disobeys commands to raise his hands and reaches for something out of the officer's sight (citing *Reese*, 926 F.2d at 500); or when the suspect ignores an order to step out of the car and instead reaches for something in the floorboard of his car (citing *Young*, 775 F.2d at 1351). *Manis*, 585 F.3d at 844.   The Court concluded in *Manis* that deadly force was not excessive when the suspect defied orders to show his hands, reached under the seat in his vehicle, and appeared to be retrieving a weapon.  *Id.* at 845.

In analyzing this case, a court is not simply to determine whether the officers used deadly force against one who did not pose a sufficient threat of harm to officers or others. This was the approach taken by the Fifth Circuit panel in *Luna v. Mullenix*, 773 F.3d 712 (5th Cir. 2014), which was recently reversed by the United States Supreme Court. *Mullenix v. Luna*, 136 S. Ct. 305, 308, 312 (2015) (per curiam). The Supreme Court noted that it "previously considered—and rejected—almost that exact formulation of the qualified immunity question …." *Id.* at 309. This not a "general" test for determining excessive force. *Id.* The "dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* at 308 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

- 18 -

In December 2014, the Fifth Circuit again upheld qualified immunity in an officer-involved shooting.   In *Thomas v. Baldwin*, the officers were engaged in a tense, dangerous scenario executing a search warrant to locate stolen firearms at a suspect's apartment. When they entered the apartment, officers identified themselves and directed the suspects to get on the ground multiple times.   *Thomas*, 595 Fed. Appx. at 381.   Only one suspect complied.   Thomas did not comply but, instead, fell to his knees and looked around as if he was searching for something, acted in a threatening manner, and the officer shot him.   *Id.*

Relying on *Manis*, *Reese*, and *Onitveros*, the Court held that the officer acted objectively reasonable in using deadly force because he "entered what he reasonably believed to be a dangerous situation, Thomas defied the officer's repeated commands, and Thomas reached for something that the officer believed to be a weapon."   *Id.*   Thus, the officer reasonably believed that the suspect posed a significant and immediate threat of death or bodily injury.   *Id.* (citing *Manis,* 585 F.3d at 843).

In this case, the summary judgment evidence indisputably shows that the circumstances Defendants faced leading up to Winzer's shooting were tense, volatile, unpredictable, and dangerous.   They include the following:

- Numerous citizens placed 911 calls reporting that Winzer was walking up and down the road, with a gun in his hand, shooting at random or threatening neighbors, and tearing up mailboxes (*Appendix* at 34-43);

- One caller quoted Winzer as yelling "everyone's going to get theirs" and he wanted to "get back what's mine" (*Id.* at 39-40);

- The callers pleaded with dispatchers to send the police to their location (*Id.* at 34-43).

- Dispatchers advised the responding officers of these calls and reports concerning Winzer before and as they arrived at the scene (*Id.* at 2-3, 8-9, 13-14, 19-20, 25-26, 44-45);

- 19 -

- When the first officers (Hinds and Trooper Hinojosa) responded to the scene and encountered Winzer in the road, he turned and fired his gun in their direction (*Id.* at 3, 8-9);

- Hinds reported over the call radio "shots fired" which the other officers heard (*Id.* at 3, 9, 44 and Exhibit G);

- Other officers arrived at the scene, received updates on the situation, and began trying to determine the best approach to engage Winzer (*Id.* at 3-4, 9, 14, 20, 26);

- Local citizens were in the area where the officers were assembling, and the officers were concerned for their safety (*Id.* at 4, 9, 14, 20, 26);

- Winzer disappeared from the responding officers' view on multiple occasions, leaving the roadway or entering wooded areas (*Id.* at 3-4, 9, 21, 26 and Exhibit F-2);

- Winzer disobeyed repeated commands to come out and drop his weapon throughout the ordeal (*Id.* at 4, 9, 20-21, 26 and Exhibit F-2);

- When Winzer suddenly appeared on a bicycle riding toward the officers, he appeared to have a gun in his hand and was starting to point it at the officers (*Id.* at 4, 9, 14-15, 21, 27 and Exhibit F-2);

- The officers feared for their own safety (*Id.* at 4, 9, 15, 21, 27);

- Winzer ignored another warning to drop his gun before all of the officers fired their service weapons at him (*Id.* at 4, 9, 21 and Exhibit F-2);

- After the shooting, Winzer disappeared again from the officers' view to an unknown location (*Id.* at 4, 9, 15, 21, 27 and Exhibit F-2);

- The officers proceeded toward his direction after several minutes and eventually found Winzer and his father in the back yard of their residence (*Id.* at 4-5, 9, 21, 27 and Exhibit F-2);

- Winzer was on the ground, and his father ignored the officers' repeated commands to move away from him and come towards them with his hands up (*Id.* at 5, 9, 21-22, 27);

- Several firearms were found inside the house, at least one of which Winzer had fired, based on the gun powder residue report. (*Id.* at 49-55);

- As the officers attempted to handcuff Winzer to secure the scene, he resisted and Huddleston deployed his taser once to try and subdue Winzer (*Id.* at 5, 15).

- 20 -

Like the Fifth Circuit observed in *Manis*, far from establishing that no reasonable officer could have believed that deadly force was lawful, the events that unfolded on the morning of April 27, 2013 authorized Defendants to use deadly force against Winzer.  *See Manis*, 585 F.3d at 846.  Moreover, the force they used was not excessive much less clearly unreasonable. In short, there is no genuine dispute of fact that Defendants possessed a reasonable belief that Winzer posed a threat of serious physical harm to themselves or others.  Hence, Defendants did not violate Winzer's Fourth Amendment rights.[7]

### 4. Defendants' Actions Were Also Objectively Reasonable Under Clearly Established Law

As noted, in an excessive force case, the Fourth Amendment "right" that must be clearly established is <u>not</u> a general right to be free from an unreasonable seizure. *Manis,* 585 F.3d at 846 n.4.  Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity. . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* (quoting *Anderson,* 483 U.S. at 639)).  Rather, the Supreme Court has explained that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."  *Id.* (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S. Ct. 1692, 1700, 143 L. Ed. 2d 818 (1999) (other citations omitted)).

The Supreme Court recently confirmed:

> We have repeatedly told courts…not to define clearly established law at a high level of generality. [citation and internal quotations omitted].  The dispositive question is whether the violative nature of *particular* conduct is clearly established. [citation and internal quotations omitted, emphasis in original]. This

---

[7] We note that Kaufman County's liability under Section 1983 must be premised on a constitutional violation committed by one of its employees.  *See In re Estate of Pollard v. Hood County*, 579 Fed. App'x. 260, 2014 U.S. App. LEXIS 16376 at *15 (5th Cir. Aug. 25, 2014) ("To impose liability on a municipality under § 1983, plaintiffs must first show that a municipal employee committed a constitutional violation.") (citing *Scott v. Moore*, 114 F.3d 51, 54 (5th Cir. 1997) (en banc).  Absent a constitutional violation, Plaintiffs' claim against Kaufman County for failure to train its employees should be summarily dismissed. *See id.*

- 21 -

> inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. [citation and internal quotations omitted]. Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."

*Mullenix*, 136 S. Ct. 305, 307, 308 (2015) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 205 (2004)). Hence, the appropriate, more particularized inquiry is whether preexisting law clearly established Winzer's right to be free from deadly force in the circumstances confronted by the individual Defendants.  *See id.* at 309; *see also Manis* at 846 (citing *Anderson*, 483 U.S. at 640-41); *see also Luna v. Mullenix*, 777 F.3d 221, 222-23 (5ᵗʰ Cir. 2014) (Jolly, J., dissenting). Moreover, the "existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.* at 308 (citation omitted).

As demonstrated above, the events on the morning of April 27, 2013 presented Defendants with circumstances that were "tense, uncertain, and rapidly evolving" forcing them to make split-second judgments in determining what level of force to use against Winzer.  Even if one could question whether the force was excessive, the qualified immunity standard protects an officer with a mistaken, yet reasonable, understanding of the law from the "hazy border between excessive and acceptable force." *See Manis* at 846 (quoting *Brosseau*, 543 U.S. at 201) (other citations omitted).  In fact, "[e]ven if contrary authority existed, the 'cases taken together [would] undoubtedly show that this area is one in which the result depends very much on the facts of each case' and certainly would not 'clearly establish' that [Defendants'] conduct violated the Fourth Amendment."  *See id.*, 585 F.3d at 846 (quoting *Brosseau v. Haugen,* 543 U.S. 194, 201, 125 S. Ct. 596, 600, 160 L. Ed. 2d 583 (2004) (internal quotations omitted).  Thus, Plaintiffs cannot demonstrate that Defendants' actions were objectively unreasonable under clearly established law.

- 22 -

     5.   The Absence or Presence of a Real Gun is Irrelevant to the Court's Summary Judgment Determination.

Plaintiffs' allege in the Third Amended Complaint that Winzer posed no danger to anyone, that he never had a gun, that he never fired a gun, or, if he did, it was only a plastic toy gun which was "clearly apparent" to others.  *See* Dkt. 23 at ¶¶ 11-12, 14 ("Gabriel was not harming anyone nor was he threatening anyone...It was clearly apparent that the gun Gabriel had in his hand was not real, based on the color of it.  Most of the neighbors were familiar with Gabriel and accustomed to seeing him in the neighborhood and did not fear him…According to Henry, Gabriel did not have the toy gun in his hands while he was on the bike."). But these assertions are directly controverted by the numerous (and contemporaneous) 911 calls from terrified citizens, the observations of the responding officers, and evidence that gunshot residue was found on Winzer. (*See Appendix* at 34-43, 49-51). More importantly, such assertions are not relevant, much less dispositive, to the qualified immunity analysis.

    As the Fifth Circuit recently stated in *Thomas v. Baldwin*:

> This court has been clear that whether the decedent actually possessed a weapon is irrelevant so long as the police officer reasonably believed he possessed a weapon. *See Reese,* 926 F.2d at 501 ("Also irrelevant is the fact that [decedent] was actually unarmed."); *Manis,* 585 F.3d at 845.

*Thomas*, 595 Fed. Appx. at 383 (citations in original).  There is no genuine dispute that Defendants reasonably believed that Winzer possessed an actual weapon based on multiple witness accounts and their own observations at the scene.  Furthermore, even if Winzer did not have a real gun while riding his bicycle in the road toward the officers, the officers reasonably believed he had a lethal weapon. Thus, Winzer's possession of an actual gun, a toy gun, or no gun is irrelevant and does not preclude summary judgment for Defendants.

- 23 -

**C.      Defendants Are Entitled to Immunity on Plaintiffs' State Law Claims for Survival and Wrongful Death**

Insofar as Plaintiffs are alleging state law claims against Defendants for survival or wrongful death, those claims should also be dismissed on the grounds of immunity.

Governmental employees, in their official capacity, are entitled to official immunity from suit arising from (1) the performance of their discretionary duties; (2) in good faith; and (3) within the scope of their authority.  *Austin v. Johnson,* 328 F.3d 204, 211 (5th Cir. 2003); *see also City of Lancaster v. Chambers,* 883 S.W.2d 650, 653 (Tex. 1994).  The "good faith" test under Texas law in determining official immunity is substantially the same standard used when determining qualified immunity in Section 1983 actions.  *Cantu v. Rocha,* 77 F.3d 795, 808 (5th Cir. 1996). Because Defendants are entitled to qualified immunity as demonstrated above, they are also immune from Plaintiffs' state law claims for wrongful death and survival.

## VII.      CONCLUSION

The individual Defendants are entitled to summary judgment on Plaintiffs' claims based on the statute of limitations and the doctrines of qualified/official immunity.  Plaintiffs' claims against Defendants Cuellar and Huddleston are not timely under the applicable limitations period.  Moreover, Plaintiffs cannot establish that any of the Defendants utilized excessive force in violation of the Fourth Amendment, or that their actions were objectively unreasonable under clearly established law.  Therefore, the Defendants respectfully request that this Court grant this Motion to Dismiss and for Summary Judgment Based on Qualified Immunity, and for such other relief to which they may be entitled.

- 24 -

Respectfully submitted,

By: /s/ S. Cass Weiland    
   S. Cass Weiland
   State Bar No. 21081300
   Robert A. Hawkins
   State Bar No. 00796726
   SQUIRE PATTON BOGGS (US) LLP
   2000 McKinney Ave, Suite 1700
   Dallas, Texas 75201
   Ph: (214) 758-1500
   Fax: (214) 758-1550
   Email: cass.weiland@squirepb.com
   robert.hawkins@squirepb.com

   ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this document was served upon all counsel of record in this matter on January 15, 2016 via the Clerk's CM/ECF electronic filing system.

   /s/ S. Cass Weiland    
   S. Cass Weiland

- 25 -